UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TEXAS BORDER COALITION,

     Plaintiff,

v.

MICHAEL CHERTOFF, SECRETARY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; ROBERT F.
JANSON, ACTING EXECUTIVE DIRECTOR,
ASSET MANAGEMENT OF U.S. CUSTOMS
AND BORDER PROTECTION,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIV. NO. 08-848 (RBW)

## DEFENDANTS' MOTION TO DISMISS

Defendants hereby move pursuant to Federal Rule of Civil Procedure 12(b)(1) and

12(b)(6) to dismiss the Complaint for lack of subject matter jurisdiction, lack of standing and

failure to state a claim.  A memorandum supporting this motion is attached hereto.

Dated: August 27, 2008    Respectfully submitted,

         RONALD J. TENPAS
          Assistant Attorney General


         /s/ Donna S. Fitzgerald
         DONNA S. FITZGERALD
        Trial Attorney
        Connecticut Bar No. 411810
        U.S. Department of Justice
        Environment & Natural Resources Division
        Natural Resources Section
        601 D. St., N.W. Room 3104
        Washington D.C. 20004
        (202) 305-0476
        Fax: (202) 305-0506
        E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

AnnMarie Highsmith
Associate Chief Counsel,
Trade and Finance
Erin Vespe
Office of Chief Counsel, CBP, U.S. Department of
Homeland Security


Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TEXAS BORDER COALITION, | | |
| | ) | CIV. NO. 08-848 (RBW) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICHAEL CHERTOFF, SECRETARY, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; ROBERT F. | ) | |
| JANSON, ACTING EXECUTIVE DIRECTOR, | ) | |
| ASSET MANAGEMENT OF U.S. CUSTOMS | ) | |
| AND BORDER PROTECTION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

**I. INTRODUCTION**

Plaintiff, a coalition of state and local government entities in the State of Texas, has filed this suit seeking declaratory and injunctive relief with respect to construction of pedestrian fence along the southwest border. The fence, known as Pedestrian Fence 225, or PF-225, is being constructed under the authority of the United States Customs and Border Protection, a component of the Department of Homeland Security (DHS) that is responsible for guarding our nation's borders. In a series of statutes enacted over the past several years, Congress has repeatedly mandated that DHS take certain steps, such as construction of pedestrian and vehicles fences, to obtain control of the southern border and prevent illegal immigration and drug smuggling. PF-225 is one of these Congressionally-mandated projects.

This Court should dismiss plaintiff's complaint, as this Court lacks subject matter jurisdiction, plaintiff lacks standing, and plaintiff has failed to state a claim.

## II. BACKGROUND

Over the past decade, Congress has enacted a series of statutes aimed at increasing operational control of the southern border, and reducing illegal traffic into the United States.  In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 8 U.S.C. § 1103.  Section 102(a) of IIRIRA required "the Attorney General[1] . . . [to] take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Id. § 102(a).

The statute requires the Attorney General to "promptly acquire such easements as may be necessary to carry out [the statute] and [to] commence construction of fences immediately following such acquisition."  8 U.S.C. § 1103 Note.  In acquiring these interests, the Attorney General "may contract for or buy any interest land . . . as soon as the lawful owner of that interest fixes a price for it and the Attorney General considers that price to be reasonable."  8 U.S.C. § 1103(b) ("Land acquisition authority").  If the Attorney General and the landowner are unable to agree upon a reasonable price, the Attorney General "may commence condemnation proceedings pursuant to the Act of August 1, 1888 (Chapter 728, 25 Stat. 357).

Responsibility for border protection transferred from the Attorney General to DHS with passage of the Homeland Security Act of 2002, Pub. L. No. 107-296.  The Act essentially created DHS from other departments, abolished the Immigration and Naturalization Service, and

---

[1]In 1996, the Department of Homeland Security did not exist, and the nation's borders were guarded by the Border Patrol, which was part of the United States Department of Justice.

transferred Border Patrol functions to the Under Secretary for Border and Transportation

Security at DHS.  See 6 U.S.C. §§ 251, 291.  The Act also amended the Immigration and

Naturalization Act to state that the Secretary of DHS has the power and duty to control and

guard U.S. borders against illegal entry.  8 U.S.C. §1103(a)(5).

      With the enactment of the Secure Fence Act of 2006, Congress mandated that the

Secretary "achieve and maintain operational control" over the entire international land and

maritime border of the United States.  P.L. 109-367 Sec. 2, 120 Stat. 2638, 8 U.S.C. 1701 Note.

Also as a part of the Secure Fence Act, Congress amended Section 102(b) of IIRIRA to require

approximately 700 miles of "reinforced fencing" along five discrete segments of the southwest

border which were specifically identified by Congress in section 102(b).  Congress also revised

section 102(b) to clarify that the barriers authorized under section 102(b) consisted of not only

fencing, but also "additional physical barriers, roads, lighting, cameras, and sensors."

      Finally, in the Consolidated Appropriations Act for Fiscal Year 2008, Congress again

amended Section 102(b) of IIRIRA.  Public Law 110-161, Div. E, Title V, § 564, 121 Stat.

2090.[2]  While the statute still calls for not less than 700 miles of fencing and other infrastructure

along the southwest border, including certain priority miles that are to be completed by December

31, 2008, where to locate such infrastructure is to be left to the discretion of the Secretary. §

564(2).  The statute now states that border infrastructure should be built where the Secretary

deems it "most practical and effective." § 564(2)(A); IIRIRA § 102(b)(1)(A).

      DHS is taking steps to fulfill its mandate to achieve and maintain operational control of

the borders and to construct the border infrastructure Congress has called for under Section 102

---

[2]For the Court's convenience, a copy of Section 564 is attached hereto as Exhibit 1.

of IIRIRA, as amended.  PF 225 is one of the projects that is aimed at satisfying the requirements

of Section 102.[3]  As alleged in plaintiff's complaint, at least 70 miles of border fence is being

constructed in the Rio Grande Valley.  Complaint at ¶ 2.  As part of the planning process for PF

225, CBP sought temporary rights of entry from individual landowners.  Complaint at ¶ 3.  Many

landowners voluntarily executed ROE's.  Complaint at ¶ 4.  For those landowners who refused to

sign the voluntary ROE's, the government filed condemnation actions to obtain access to the

affected parcels.  Complaint at ¶¶ 3,4.

## III.  ARGUMENT

### A.     THIS COURT LACKS SUBJECT MATTER JURISDICTION.

Defendants hereby move to dismiss this action pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim

upon which relief can be granted.  Auster v. Ghana Airways, Ltd., 514 F.3d 44, 48 (D.C. Cir.

2008) (when a court lacks subject matter jurisdiction, it must dismiss the case, and not grant

summary judgment).  The party claiming subject matter jurisdiction has the burden of

demonstrating it exists.  Khadr v. United States, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

Plaintiff alleges jurisdiction based on three statutes:  28 U.S.C. §§ 1331 (federal question

jurisdiction), 1358 (condemnation), and 1361 (mandamus jurisdiction). Complaint at ¶ 9.  These

do not provide a valid basis for exercising jurisdiction here.

It is well settled that 28 U.S.C. § 1331, the general federal question statute, does not

constitute a waiver of the United States' sovereign immunity.  "[T]he federal question statute is

---

[3]PF 225 is being carried out simultaneously with another project called Vehicle Fence 300 ("VF300").  VF 300 involves the construction of approximately 300 miles of vehicle fencing along the southern border of the United States.

not a general waiver of sovereign immunity; it merely establishes a subject matter that is within

the competence of the courts to entertain." Whittle v. United States, 7 F.3d 1259, 1262 (6th Cir.

1993). A waiver of immunity, "if it exists at all, must be found in the statute giving rise to the

cause of action." Garcia v. United States, 666 F.2d 960, 966 (5th Cir. Unit B 1982). While

plaintiff cites the APA, 5 U.S.C. § 702 as the basis for waiving sovereign immunity, Complaint at

¶ 9, that argument fails, as discussed below.

Similarly, plaintiff cannot rely on the mandamus act, 28 U.S.C. § 1361, as it is not a

waiver of sovereign immunity, and cannot be invoked in the circumstances here. Section 1361

provides that "[t]he district courts shall have original jurisdiction of any action in the nature of

mandamus to compel an officer or employee of the United States or any agency thereof to

perform a duty owed to plaintiff." 28 U.S.C. § 1361. Mandamus is an extraordinary remedy that

may be invoked only if plaintiff has a clear right to the relief it seeks, 2) defendants have a clear

duty to act; and 3) there is no other adequate remedy available to plaintiff. In re Medicare

Reimbursement Litigation, 414 F.3d 7, 10 (D.C. Cir. 2005). Even when these three requirements

are met, a court may grant relief only when it finds "compelling . . . equitable grounds." Id. (Cit.

omitted). Moreover, mandamus does not provide a waiver of sovereign immunity. Washington

Legal Foundation v. United States Sentencing Commission, 89 F.3d 897, 901 (D.C. Cir. 1996).

Plaintiff has not, and cannot, establish mandamus jurisdiction. Nothing in the seven counts

of the complaint establishes a clear right to the relief requested, or a clear duty on the part of the

government to act. In fact, the Seventh Cause of Action explicitly acknowledges Secretary

Chertoff's discretion regarding the location of the border fence, ("Failure to exercise discretion

regarding location of border wall), and, nevertheless, seeks mandamus jurisdiction to force the

5

Secretary to exercise that discretion in a manner that plaintiff approves.

Moreover, an adequate remedy at law was available to the members of the Texas Border Coalition that were actually served with a notice of condemnation for either a temporary or permanent estate – as  defendants in those condemnation actions, they could challenge the government's authority to condemn.

Moreover, plaintiff cannot rely on the condemnation statute at 28 U.S.C. § 1358 as the basis for jurisdiction here.  Complaint at ¶ 9.  The statute provides: "The district courts shall have original jurisdiction of all proceedings to condemn real estate for the use of the United States or its department or agencies."  28 U.S.C. § 1358.  The jurisdictional grant of § 1358 is limited to condemnation actions brought by the United States, and does not provide subject matter jurisdiction for plaintiff's action here, which is not a condemnation action.

Finally, while the APA is a limited waiver of sovereign immunity, plaintiff's citation to it (Complaint at ¶ 9) fails, because the complaint does not identify final agency action, a requirement in seeking judicial review under the APA.  Fund for Animals v. BLM, 460 F.3d 13, 18 and n.4 (D.C. Cir. 2006) (failing to identify a final agency action challengeable under the APA is grounds for dismissal under Federal Rule of Civil Procedure 12(b)(6), not Rule 12(b)(1)).  The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702 (emphasis added).  Thus, plaintiff must "identify some 'agency action' that affects it in the specified fashion; it is judicial review 'thereof' to which [they] are entitled." Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990) ("NWF").

Not every activity performed by an agency constitutes "agency action" as defined in the

6

APA.  Rather, "agency action" includes "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13).  A "failure to act" is merely "a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)."  Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542 U.S. 55, 62 (2004).  "All of those categories involve circumscribed, discrete agency actions, as their definitions make clear."  Id.; see  5 U.S.C. §§ 551(4) (defining "rule"), (6) ("order") (8) ("license"), 10 ("sanction"), (11) ("relief").

    "[T]he 'agency action' in question must [also] be 'final agency action.'"  NWF, 497 U.S. at 882 (quoting 5 U.S.C. § 704).  To be final, (1) the action should mark the consummation of the agency's decision-making process; and (2) the action should be one by which rights or obligations have been determined or from which legal consequences flow.  Bennett v. Spear, 520 U.S. 154, 177-78 (1997).

    In NWF, the Supreme Court held that the APA's requirement of a discrete "final agency action" precludes "general judicial review of [an agency's] day-to-day operations."  497 U.S. at 899.  The plaintiff in that case alleged that the Bureau of Land Management's ("BLM") practice of reclassifying public lands that had previously been "withdrawn" from mineral leasing and mining activities violated NEPA and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 et seq.  Id. at 875.  The plaintiff dubbed this practice, which consisted of 1250 individual land classifications and withdrawal revocations, including some that had not yet occurred, the "land withdrawal review program."  Id.  In an effort to prove standing, plaintiff's members submitted six affidavits identifying particular land status determinations that purportedly harmed them.  497 U.S. at 880-81, 885-86.

The Supreme Court held that it was "impossible" that the affidavits would enable the plaintiff to challenge the "land withdrawal review program" because the "program" was not an "agency action" – much less a "final agency action" – within the meaning of the APA:

> The term 'land withdrawal review program' . . . does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations.  It is simply the name by which petitioners have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by the FLPMA.  It is no more an identifiable 'agency action' – much less a final agency action' – than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration.

NWF, 497 U.S. at 890.  The Court also made clear that even if one land status determination was a "final agency action," the plaintiff could not predicate its sweeping programmatic challenge on that single action:

> [I]t is at least entirely certain that the flaws in the entire 'program' – consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well – cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

Id. at 892-93.  Rather, under the terms of the APA, a plaintiff must "direct its attack against some particular 'agency action' that causes it harm."  Id. at 891.

The Supreme Court reaffirmed the APA's bar on programmatic challenges in Norton v. SUWA, 542 U.S. 55 (2004).  The environmental groups in SUWA alleged that BLM had violated FLPMA's mandate to manage certain wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness."  Id. at 59 (quoting 43 U.S.C. § 1782(c)). Plaintiffs brought suit pursuant to the APA's provision of a cause of action to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).  The Supreme Court

8

held that the plaintiffs' claims did not fall within the scope of § 706(1) because "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a <u>discrete</u> action that it is <u>required to take</u>." 542 U.S. at 64 (emphasis in original).

"The important point is that a 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a <u>discrete</u> action." <u>Id.</u> at 63 (emphasis in original). The Court made clear that "[t]he limitation to discrete agency action precludes the kind of broad programmatic attack [the Court] rejected in [<u>NWF</u>]." <u>Id.</u> at 64. Thus, the plaintiff in <u>NWF</u> "would have fared no better if [it] had characterized the agency's alleged 'failure to revise land use plans in proper fashion' and 'failure to consider multiple use' . . . in terms of 'agency action unlawfully withheld' under § 706(1), rather than agency action 'not in accordance with law' under § 706(2)." <u>Id.</u> at 65.

The Court explained that the limitations in the APA are intended to (a) protect agencies from undue judicial interference with their lawful discretion, and (b) protect courts from having to enter "general orders compelling compliance with broad statutory mandates" that would "inject[] the judge into day-to-day agency management." <u>Id.</u> at 66-67. The APA's programmatic challenge bar "is motivated by institutional limits on courts which constrain [their] review to narrow and concrete actual controversies." <u>Sierra Club v. Peterson</u>, 228 F.3d 559, 566 (5th Cir. 2000) (<u>en banc</u>).

In this case, plaintiff has failed to challenge discrete agency action, much less final agency action, and it has brought precisely the type of sweeping programmatic challenge prohibited by <u>NWF</u> and its progeny. The counts in the complaint challenge only undefined series of activities, including past condemnations for temporary rights of entry so that agency personnel could survey

border lands, alleged attempts to secure waivers of property rights, and alleged threats to condemn property.  See, e.g., Complaint at ¶ 3-4.

For example, the First Cause of Action purports to challenge the "securing or attempting to secure waivers of plaintiff's property rights [ ] without informing plaintiff's members or their proposed class members of their right to negotiate a fixed price under Section 102 of the IIRIRA, or engaging in such negotiations before seeking condemnation."  According to plaintiff, defendants violated IIRIRA and the due process and equal protection clauses of the Fifth Amendment by engaging in these undefined actions.  Complaint at ¶ 38.

The Second Cause of Action challenges defendants' failure to issue or apply any rules, regulations, directives, guidelines, or instructions relating to "how negotiations under Section 102 of the IIRIRA should proceed, or how a fixed price should be arrived at," and asserts that such failure is a violation of the APA and the due process and equal protection clauses of the Fifth Amendment.  Complaint at ¶ 40.

The Third Cause of Action purports to challenge "threat[s] to condemn" and actual condemnations pursuant to the Declaration of Taking Act, 40 U.S.C. § 3114, as violative of the IIRIRA and the due process and equal protection clauses of the Fifth Amendment.  Complaint at ¶ 42.  The Fourth Cause of Action purports to challenge "threat[s] to condemn," the obtaining of waivers of property rights, and actual condemnations as allegedly conducted without consulting, as required by IIRIRA, and therefore violative of IIRIRA and the due process and equal protection clauses of the Fifth Amendment.  Complaint at ¶ 44.

The Fifth Cause of Action purports to challenge "defendants' failure to issue or apply [or to make known to plaintiff] rules, regulations, directives, instructions or guidelines" to implement

10

the consultation provision of IIRIRA.  Complaint at ¶ 46.  The Sixth Cause of Action challenges

"[d]efendants' targeting of properties for surveying and likely border-fence construction" as

purportedly selective based on "political and other considerations," and therefore, violative of the

Fifth Amendment's equal protection clause.  Finally, the Seventh Cause of Action challenges

defendants' purported failure to "assess the most practical and effective locations for a border

fence or wall," and "moving forward to build the border wall or fence in the areas set forth in the

now-repealed provisions of the Secure Fence Act of 2006."  Complaint at ¶ 50.

　　　　Simply put, the infinite set of past, present and future activities undertaken as part of the

construction of the border fence is not discrete "agency action," much less "final agency action"

within the meaning of the APA.  See NWF, 497 U.S. at 890 (suit challenging "the continuing (and

thus constantly changing) operations of the BLM" in reviewing 1250 land reclassifications did not

challenge discrete "final agency action"); Sierra Club, 228 F.3d at 566 (suit challenging "past,

ongoing, and future timber sales approved by the Forest Service" in several national forests not

limited to discrete "final agency actions"); Center for Biological Diversity v. Veneman, 394 F.3d

1108, 1111-13 (9th Cir. 2005) (suit alleging that Forest Service violated statutory duty to consider

57 rivers eligible for protected status during land use planning did not challenge discrete "final

agency action"); National Wildlife Fed'n v. Caldera, Civ. No. 00-1031, 2002 WL 628649, at *2-4

(D.D.C. 2002) (suit seeking order directing Army Corps of Engineers to engage in ESA

consultation for "all Corps-permitted development projects" not limited to discrete "final agency

action"); see also Chemical Weapons Working Group, Inc. v. Dep't of the Army, 111 F.3d 1485,

1495 (10th Cir. 1997) (dismissing challenge to Army's testing of chemical weapons disposal

system because plaintiffs "fail to explain how the Army's operational testing . . . constitutes a

'rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act'").

Any doubt about the improper programmatic nature of plaintiff's claims is eliminated by its sweeping prayer for relief. Plaintiff does not seek to redress any particularized injury resulting from some discrete "final agency action." On the contrary, it seeks a generic order "[d]eclar[ing] that defendants' actions as alleged throughout this Complaint violate the IIRIRA [as amended] and the due process and equal protection guarantees of the Fifth Amendment;" and "[i]ssue injunctive relief requiring that defendants, their agents, employees, and successors in office comply with the IIRIRA [as amended] and the taking clause and due process and equal protection guarantees of the Fifth Amendment to the United States Constitution." Complaint at Prayer for Relief.

It is apparent that plaintiff is attempting to bring the same type of non-justiciable, loosely defined programmatic challenge as the plaintiffs in Lujan and Norton, and such a programmatic challenge is not allowed under Supreme Court progeny.

## B.  TEXAS BORDER COALITION LACKS STANDING

This Court should also dismiss the complaint for lack of standing. Standing is "an essential and unchanging predicate to any exercise of a court's jurisdiction." Reese Brothers, Inc. v. U.S. Postal Service, 531 F.Supp.2d 64, 67 (D.D.C. 2008). The critical threshold inquiry in the invocation of the jurisdiction of the federal courts is whether plaintiff has demonstrated a sufficient "case or controversy," i.e., whether plaintiff has alleged such a personal stake in the outcome in the outcome of the controversy as to warrant invocation of federal court jurisdiction and its remedial powers. Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (internal quotation marks and cit. omitted).

Moreover, to satisfy the requirements for associational standing, an organizational plaintiff must demonstrate that 1) its members would otherwise have standing to sue in their own right, 2) the interests it seeks to protect are germane to the organization's purpose, and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 342-43 (1977).[4] Organizations are obligated to allege facts sufficient to establish that one or more of their members has suffered or is threatened with an injury.  Valley Forge Christian College, 454 U.S. at 487 n. 23.  This obligation extends to identifying the member or members that have or will suffer harm, and requires a certain degree of specificity in delineating the injury.  American Immigration Lawyers Ass'n v. Reno, 18 F.Supp.2d 38, 51 (D.D.C. 1998) (cits. omitted).

The complaint fails to meet this requisites.  While Texas Border Coalition is the named organizational plaintiff, the complaint fails to identify how specific members of TBC have been harmed or will be harmed by the alleged violations of law.  The complaint merely presumes that all members of TBC (see pars. 12-15 of Complaint) have been harmed or will be harmed by the violations alleged, such as DHS's alleged failure to negotiate, and the alleged failure to consult as required by the 2008 Appropriations Act, but there is no description or delineation of an injury, and no identification of the specific members harmed.  See American Immigration Lawyers Ass'n , 18 F.Supp.2d at 51 (holding plaintiffs failed to demonstrate standing when, inter alia, their pleadings failed to "identify one injured person by name, allege that the injured person is a member of the [specific] plaintiff organization[], or allege facts sufficient to establish the harm to

---

[4]The Complaint also alleges that Texas Border Coalition will be seeking to certify a class. Complaint at ¶¶ 18-22.  Defendants will raise their objections to class certification if and when plaintiff moves to certify a class, assuming the complaint survives this motion to dismiss.

13

that member."). The injury alleged cannot be speculative. <u>Id</u>. Instead, TBC must allege that a member will be "perceptibly harmed by the challenged agency action." <u>Id</u>.

Nowhere in the Complaint does plaintiff identify a single member that has been allegedly injured due to the violations alleged. For example, while plaintiff contends that the government failed to properly negotiate for a fixed price in the condemnations (First Cause of Action), that it failed to issue or apply rules or other regulations establishing how negotiations under IIRIRA should proceed, and how a fixed price should be determined (Second Cause of Action), and that the condemnation actions were without proper legal authority (Third Cause of Action), TBC fails to identify a single member of its organization that was allegedly injured by these alleged violations of law.

Likewise, while plaintiff alleges a failure to properly consult as required by the 2008 Appropriations Act, (Fourth Cause of Action), and a failure to issue rules or other regulations to implement the consultation provision (Fifth Cause of Action), plaintiff fails to identify a single member that has purportedly been injured or will be injured by a failure to consult, or a failure to promulgate rules or regulations implementing the consultation requirement.

Lastly, while plaintiff contends the government has targeted certain properties for surveying and fence construction for improper, political reasons, (Sixth Cause of Action) and has failed to properly exercise its discretion in locating the fence (Seventh Cause of Action), plaintiff has again failed to identify a single member of its group that has been injured or will be injured by the allegedly improper decision-making related to locating the fence.

In the absence of such a demonstration, plaintiff has failed to demonstrate the requisite Article III standing. "A mere interest in a problem, no matter how longstanding the interest and

no matter how qualified the organization is in evaluating the problem," is not sufficient to confer

standing.  Sierra Club v. Morton, 405 U.S. 727, 739 (1972) (internal quotation marks omitted).

### C.  THE COMPLAINT FAILS TO STATE A CLAIM.

Even if plaintiff could establish jurisdiction, this Court should dismiss individual causes of

action for failure to state a claim.  Those are addressed separately below.[5]

> **1.  THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED BECAUSE ACTUAL NEGOTIATION WITH LANDOWNERS IS NOT REQUIRED PRIOR TO CONDEMNATION UNDER THE AUTHORIZING LEGISLATION AND, FURTHERMORE, THE UNITED STATES DID ATTEMPT TO NEGOTIATE WITH LANDOWNERS.**

Section 102 of IIRIRA grants the United States the power to purchase property.  *See* 8

U.S.C. § 1103(b)(1).  When the United States has authority to purchase property, it has the

coextensive authority to condemn property, United States ex rel. Tenn. Valley Auth. v. Welch,

327 U.S. 546, 554 (1946), and negotiation is not required.

Federal statutes authorizing the condemnation of property are liberally construed.[6]  Here,

---

[5]In reviewing this argument, this Court must accept as true all of the factual allegations in the Complaint.  Kassem v. Washington Hospital Center, 513 F.3d 251, 253 (D.C. Cir. 2008).

[6] The United States has filed hundreds of condemnation actions in connection with the PF-225 border security project in federal district courts in the California, New Mexico, Arizona, and Texas.  One court, the U.S. District Court for the Southern District of Texas, Brownsville Division, incorrectly interpreted this "unable to agree" provision to require the United States to under take "bona fide negotiations" prior to receiving possession of the condemned properties.  See United States v. 1.04 Acres of Land, 538 F.Supp.2d 995, 1010-12 (S.D. Tex. 2008).  As stated infra, that interpretation is inconsistent with Supreme Court precedent, Nat'l R.R. Passenger Corp. v. Boston & Me. Corp., 503 U.S. 407, 423 (1992) (specifically rejecting contention that 45 U.S.C. § 563(d)(1) "demands that [the condemning authority] engage in 'good faith . . . negotiations' before it may invoke its condemnation powers"), and at odds with every other district court's treatment of the statute to date.  See, e.g., United States v. 233.0 Acres of Land (City of Eagle Pass), Civil No. DR-08-CA-003, (W.D. Tex. Jan. 14, 2008) (order granting United States' ex parte motion for possession of condemned property interest in connection with

IIRIRA states that when the United States and a landowner are "unable to agree," condemnation

proceedings may be initiated.  *See* 8 U.S.C. § 1103(b)(3).  In <u>National Railroad Passenger Corp.</u>

<u>v. Boston & Maine Corp.</u>, 503 U.S. 407 (1992), a condemnation action was brought pursuant to

a similarly worded statute, 45 U.S.C. § 562(d), which granted condemnation authority when the

parties were unable to agree.  The landowner claimed that such language required "good faith . . .

negotiations" before condemnation.  <u>Id</u>. at 423.  The Supreme Court disagreed, upholding the

agency's determination that the statute only mandated a factual determination by the condemning

authority that the parties would not be able to reach an agreement through further negotiations.

<u>Id</u>.; <u>see also United States v. Meyer</u>, 113 F.2d 387, 394 (7th Cir. 1940) (holding that United

States' power of condemnation "is not limited by any condition precedent such as the duty to

endeavor to purchase the property").  "Emphasis has been focused upon the purposes to be

accomplished, and <u>such legislation has been treated with extreme liberality to effectuate the</u>

<u>promotion of constitutional federal projects</u>."  <u>United States v. 1.33 Acres of Land</u>, 9 F.3d 70, 72

(9th Cir. 1993) (emphasis in original) (quoting <u>United States v. Kennedy</u>, 278 F.2d 121, 126 n.17

(9th Cir. 1960)).

Here, although the extent of negotiations may not have satisfied plaintiff, plaintiff

concedes that some effort was made at negotiation.  Complaint at ¶ 4.  Under the precedent

discussed above, those efforts were sufficient since the power of condemnation "is not limited by

any condition precedent such as the duty to endeavor to purchase the property."  <u>Meyer</u>, 113 F.2d

at 394.  Indeed, to the extent there were instances where one party refused to enter into

---

PF225 border security project) (Exh. 2 hereto); <u>United States v. 5.27 Acres of Land</u>, Civil No.
3:08-cv-1162 (S.D. Cal. Aug. 20, 2008) (same) (Exh. 3 hereto); <u>United States v. 1.03 Acres of</u>
<u>Land</u>, Civil No. 08-cv-033 (D. Ariz. Feb. 1, 2008) (same) (Exh. 4 hereto).

negotiations or could not be located does not render the United States powerless to move forward in acquiring investigatory rights in accord with a legislatively mandated public works project.  In light of the Supreme Court precedent and given pressing time constraints imposed by Congress for this project, the United States was free to conclude that agreement with some landowners was not possible, and that therefore condemnation was necessary.

The reference to a negotiated price would be an impossibility if a landowner is never willing to agree to any price.  See Kohl v. United States, 91 U.S. 367, 371 (1875) ("If the right to acquire property . . . may be made a barren right by the unwillingness of property-holders to sell . . . the constitutional grants of power may be rendered nugatory, and the government is dependent for its practical existence upon the will of . . . a private citizen.  This cannot be.").  Moreover, this price must reflect market value that is fair to both the landowner and the taxpayer, and not wholly the will of the individual.  See Bauman v. Ross, 167 U.S. 548, 574 (1897) ("compensation [must be] just, not merely to the individual whose property is taken, but to the public which is to pay for it") (quoting Searl v Sch. Dist., 133 U.S. 553, 562 (1890)).  Thus, a failure to negotiate a compensation amount agreeable to both parties does not undermine the authority of the United States pursuant to Section 1103(b) to institute a condemnation proceeding.

**2.    THERE IS NO CAUSE OF ACTION UNDER THE SECOND AND FIFTH CAUSES OF ACTION BECAUSE RULEMAKING IS NOT LEGALLY REQUIRED HERE.**

To the extent the Second and Fifth Causes of Action are intended to assert a "failure to act" argument under the APA, 5 U.S.C. § 701, the United States' "failure" to distribute satisfactory guidance regarding negotiation and consultation does not constitute an illegal failure

17

to act under the APA.  See Second and Fifth Causes of Action.  In order to prevail on these claims, plaintiff must show that the alleged agency inaction is encompassed within the definition of judicially reviewable "agency action" under the APA, which it has failed to do.

As the Supreme Court clarified in Norton v. Southern Utah Wilderness Alliance, in order for a court to compel agency action unlawfully withheld under 5 U.S.C. § 706(1), two jurisdictional prerequisites must be satisfied:  (1) the plaintiff must identify a failure to take a discrete "agency action," as defined under the APA; and (2) such action must be one that the agency is legally required to take.  542 U.S. 55, 62-64 (2004).  In SUWA, the Supreme Court construed the phrase "failure to act" as limited to a failure to take an agency action, as defined in 5 U.S.C. § 551(3).  Id. at 62.  The Supreme Court, examining 5 U.S.C. § 551(13), observed that the APA begins its definition of the term agency action "with a list of five categories of decisions made or outcomes implemented by an agency—'agency rule, order, license, sanction [or] relief.' All of these categories involve circumscribed, discrete agency action."  Id. (citations omitted) (emphasis added).

The Supreme Court also went on the find that the agency action sought to be compelled must be one that the agency is legally required to take, a notion inherited from pre-APA practice under the All Writs Act, 28 U.S.C. § 1651 (encompassing the writ of mandamus), and preserved in the APA's authorization for courts to "compel agency action unlawfully withheld."  5 U.S.C. § 706(1); SUWA, 542 US at 63.  The Supreme Court explained that "[t]he mandamus remedy was normally limited to enforcement of 'a specific unequivocal command,' [or] the ordering of a 'precise, definite act . . . about which [an official] had no discretion whatever.'"  Id. (citations omitted).

Accordingly, the Supreme Court concluded that a claim for failure to act may only proceed where a plaintiff asserts that "an agency failed to take a <u>discrete</u> agency action that it is <u>required to take</u>." <u>Id</u>. at 64 (emphasis in original). As the Supreme Court observed, "[t]he limitation to <u>required</u> agency action rules out judicial direction of even a discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law)." <u>Id</u>. at 65. "[T]he framework set forth in SUWA expressly applies to all claims of agency inaction." <u>Blancett v. U.S. Bureau of Land Management</u>, 2006 WL 696050 at *6 n.5 (D.D.C. 2006). Of particular relevance, "[t]he only agency action that can be compelled under the APA is action legally <u>required</u>." <u>SUWA</u>, 542 U.S. at 63. As discussed below, plaintiff is, in essence, asking this Court to find that DHS must take action and issue rules and/or guidance, despite the fact that they have failed to show there is any legal authority under which the DHS is required to do so. Further, no such legal requirement exists concerning either negotiation or consultation.

As the Supreme Court held in <u>National Railroad Passenger Corp.</u>, the "unable to agree" language "mandate[s] nothing more than a factual determination [by the condemning authority] that the parties will not be able to reach agreement through further negotiations." <u>Nat'l R.R. Passenger Corp.</u>, 503 U.S. at 423 (1992) (construing 45 U.S.C. § 562(d)). As with § 562(d)(1), here § 1103(b)(3) is reasonably interpreted, not as a statutory precondition of the United States' authority to bring a condemnation suit, but rather, only as a requirement that prior to filing suit the United States factually conclude as to any given property that further negotiations with the landowner will not result in an agreement on the price to be paid for that property or an interest therein. The United States made such factual conclusions in the cases filed in Texas by determining that it was necessary to file condemnation suits.

19

As such, plaintiff's claim is not actionable under the APA because it cannot point to a statutory or regulatory requirement that DHS is "legally required" to provide guidance on negotiation—the second element required where an agency failure to act is challenged.  See SUWA, 542 U.S. at 63-64.  Indeed, hundreds of landowners not involved in this action were able to reach agreements allowing the United States temporary access to their properties without additional administrative guidance.[7]

Similarly, no statute or regulation requires rulemaking or similar agency action with regard to consultation under the Illegal Immigration Act.  The consultation provision simply states:

> In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

2008 Consol. Appropriations Act, § 564(b)(1)(C)(I) (codified at 8 U.S.C. § 1103(b) note).  The provision provides for consultation; however, any requirement – or even suggestion of a requirement – to create and disburse administrative guidance is notably absent from the provision.  As such, plaintiff cannot identify in the applicable law any such unequivocal command that the agency this specific action, and DHS cannot be compelled by plaintiff or this Court to issue rules or regulations.

### 3.    THE THIRD CAUSE OF ACTION FAILS TO STATE A CLAIM BECAUSE THE UNTIED STATES IS AUTHORIZED TO USE THE DECLARATION OF TAKING ACT.

---

[7]See, e.g., United States v. 37.51 Acres of Land (University of Texas-Brownsville), Civil Action No. B-08-056 (S.D. Tex. Aug. 6, 2008) (Exh. 5 hereto) (recognizing settlement agreement reached between United States and landowner University of Texas-Brownsville).

In its Third Cause of Action, plaintiff contends the United States improperly relied, and will continue to rely, on the Declaration of Taking Act ("DT Act"), 40 U.S.C. § 3114, rather than condemnation procedures at 40 U.S.C. § 3113, in violation of IIRIRA, and the equal protection and due process clauses of the Constitution. Third Cause of Action. Plaintiff's claim has no merit.

Contrary to plaintiff's claims, the plain language of the IIRIRA does not expressly preclude the United States from utilizing the DT Act in order to acquire property by condemnation under 40 U.S.C. § 3113. Indeed, in light of the December 31, 2008, deadline imposed in the IIRIRA, as amended by the 2008 Appropriations Act, it may be inferred that Congress logically envisioned use of the expedited procedures set forth in the DT Act to acquire the necessary property interests.

Under the plain language of federal condemnation statutes and relevant case law, the United States is authorized to utilize the expedited procedures set forth in the DT Act in any case in which it is authorized to acquire property by condemnation under 40 U.S.C. § 3113. The DT Act provides, in pertinent part:

> <u>In any proceeding</u> in any court of the United States outside of the District of Columbia brought by and in the name of the United States and under the authority of the Federal Government to acquire land, or an easement or right of way in land, for the public use, the petitioner may file, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the land described in the petition, declaring that the land is taken for the use of the Government.

40 U.S.C. § 3114(a) (emphasis added). The plain language of this provision states that the United States "may file" a declaration of taking "in any proceeding," which logically includes

any condemnation proceeding brought under 40 U.S.C. § 3113. Id.; see also Polson Logging Co.

v. United States, 149 F.2d 877, 878 (9th Cir. 1945) ("The right of taking of the [DT Act] is by

the terms of that act a right of the United States in all proceedings for condemnation outside the

District of Columbia.").

As the Supreme Court has recognized, the expedited procedure set forth in the DT Act is

merely "ancillary to the main condemnation proceeding." Catlin v. United States, 324 U.S. 229,

240-41 (1945). see also West, Inc. v. United States, 374 F.2d 218, 224 (5th Cir. 1967) (holding

that DT Act is "complementary to and congenial with" condemnation procedures set forth in Rule

71.1 of the Federal Rules of Civil Procedure).

> It is clear that the only purpose of [the DT Act] was to permit the Government to
> quickly have possession of land needed for public use, and that the Act must be
> construed along with Section 258 and other earlier provisions of Title 40.

United States v. 2,049.85 Acres of Land, 45 F. Supp. 731, 732 (S.D. Tex. 1942).  Thus, the DT

Act and 40 U.S.C. § 3113 are not mutually exclusive.

Section 102(d) of the IIRIRA authorizes the United States to acquire property by

condemnation under 40 U.S.C. § 3113, and absent any express statement to the contrary, the

United States may also utilize the ancillary expedited procedures set forth under the DT Act.  40

U.S.C. § 3114(a); see also Catlin, 324 U.S. at 240-41; Polson, 149 F.2d at 878; West, 374 F.2d at

224.

Construing section 102(d) of the IIRIRA together with the 2008 Appropriations Act, it

may be inferred that Congress anticipated use of the DT Act in order to expedite the transfer of

title and thereby meet the December 31, 2008, deadline for completion of the project.  United

States v. Rodriguez, 60 F.3d 193, 196 (5th Cir. 1995) (statutes relating to the same subject

should be construed together).  Congress was obviously aware of the differences between

"straight" or "complaint-only" condemnation procedures and "quick-take" procedures in which

the United States elects to use the DT Act in order to expedite the transfer of possession.

Similarly, Congress also would have been aware that without utilizing the DT Act, the United

States likely would not acquire possession in time to meet the December 31, 2008, deadline set

forth in the 2008 Appropriations Act.[8]  Thus, by imposing this deadline under the 2008

Appropriations Act, it is evident that Congress intended for the United States to utilize the

expedited procedures set forth in the DT Act to acquire the property interests necessary for the

project.  Because the IIRIRA contains no express provision prohibiting use of the DT Act, and in

light of the congressionally mandated deadlines that could only be met by use of the DT Act, the

United States was authorized to utilize the DT Act here.

Accordingly, in the condemnation cases to date, the United States has filed both a

Complaint in Condemnation in accordance with 40 U.S.C. § 3113, and a Declaration of Taking in

accordance with 40 U.S.C. § 3114.  By electing to file a Declaration of Taking in the border fence

condemnation proceedings, the United States has merely exercised its rightful and lawful

discretion to utilize an expedited procedure for the transfer of title and payment of estimated just

compensation.  See, e.g., 2,049.85 Acres of Land, 45 F. Supp. at 732.  "Since Congress has

authorized the Attorney General to bring condemnation actions in federal court pursuant to 40

U.S.C. § 3113, the procedures set out in Rule 71.1 and the [Declaration of Taking Act] are

---

[8] Indeed, given that acquisition of the necessary property could potentially involve filing two separate condemnation actions – one for the temporary rights of access to conduct investigatory work and a subsequent action to acquire fee simple for actual fence construction – it simply would not be possible for the United States to meet the congressionally-mandated December 31, 2008 deadline without utilizing the DT Act.

available to the United States in those actions, ancillary to the Government's authority to bring the action under the [General Condemnation Act]." United States v. 1.04 Acres of Land, 538 F.Supp.2d 995, 1007 (S.D. Tex. 2008) (in landowner challenge to condemnation of temporary rights of entry, holding that the DTA is "inherent and incidental" in all condemnation actions brought under the General Condemnation Act). Thus, plaintiff's Third Cause of Action does not state a claim.

      **4.      THERE IS NO CAUSE OF ACTION UNDER THE CONSULTATION PROVISION OF THE 2008 APPROPRIATIONS ACT, AND THE FOURTH CAUSE OF ACTION MUST BE DISMISSED WITH PREJUDICE.**

      Plaintiff cannot challenge the Secretary's compliance with the consultation provision of the 2008 Appropriation Act because the statute explicitly precludes such a right of action, and the consultation actions are committed to agency discretion by law.

      Section 102(b)(1)(C)(i), as amended by the Consolidated Appropriations Act for 2008, directs that the Secretary:

> ". . . shall consult with the Secretary of Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."

      8 U.S.C. § 1103 note.[9]  Congress further provided, however, that "[n]othing in this subparagraph may be construed to create or negate any right of action for a State, local

---

[9]In the legislative history to the consultation provision, Consolidated Appropriations Act of 2008, Pub. L. 110-161, 121 Stat. 2090 (2007), the House Committee on Appropriations stated that:
> [The Committee] is aware that [DHS] has recently begun to consult with States and local government in some affected border communities, and directs the Secretary to continue such consultation or initiate it immediately.

H.R. REP. NO. 110-181, at 37 (2007) (relevant pages attached as Exh. 6 hereto).

government, or other person or entity affected by this subsection."  8 U.S.C. § 1103 note (§

102(b)(1)(C)(ii)(I).[10]  Thus, plaintiff can only pursue its Fourth Cause of Action, failure to satisfy

the consultation requirement of the statute, if a statute that pre-dated the 2008 Appropriations

Act provided such a right of review.  Plaintiff cannot rely on the consultation provision of the

2008 Appropriations Act, because the savings provision explicitly precludes any right to judicial

review if that right is based on the 2008 Act itself .  "Nothing in this subparagraph may be

construed to <u>create</u> or negate any right of action . . . .") (emphasis added).

     While the savings provision makes clear it does not negate any action, any such claim must

be based on a consultation requirement that existed before the 2008 Appropriations Act, since the

Act itself does not create any right of action.  The Fourth Cause of Action does not cite to any

pre-exising consultation requirement, but instead relies on the 2008 Appropriations Act

language.[11]  Thus, the Fourth Cause of Action should be dismissed.

     Moreover, even if the consultation provision were not subject to a savings provision,

DHS's consultation is committed to agency discretion, and cannot give rise to any legal claim.

Section 701 of the Administrative Procedure Act precludes judicial review of agency action when

the challenged agency action is committed to agency discretion by law.  5 U.S.C. §701(a)(2).  In

---

[10] The savings provision further states that "[n]othing in this subparagraph may be construed to affect the eminent domain laws of the United States or of any State."  § 102(b)(1)(C)(ii)(II).  This further demonstrates Congress's intent that the consultation provision not give rise to any affirmative right of action, as the eminent domain language in the savings provision makes it clear that although the Secretary was to consult with affected communities and landowners, it did not intend for the consultation provision to actually impede or prevent construction of the Congressionally-mandated border infrastructure proscribed in Section 102 of IIRIRA.

[11]In fact, prior to the 2008 Appropriations Act amendments to the IIRIRA, there was no consultation requirement in IIRIRA.

such cases, review is precluded because "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Heckler v. Chaney, 470 U.S. 821, 830 (1985) (holding agency's decision against taking requested enforcement action was agency action committed to agency discretion, and therefore, not judicially reviewable under the APA).

Nothing in the consultation provision of the 2008 Appropriations Act provides any standard by which to judge DHS's consultation efforts. While DHS is consulting in accordance with this statute, there is no basis for measuring its compliance, and that, combined with the savings provision disallowing any judicial review, demonstrates that the consultation requirement is committed to agency discretion by law.[12]

>     **5**.    **PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS BECAUSE THE CONDEMNATIONS ARE RATIONALLY RELATED TO A CONGRESSIONALLY AUTHORIZED PUBLIC PURPOSE, AND THIS COURT CAN LOOK NO FURTHER.**

Finally, the Sixth Cause of Action fails to state a claim, as plaintiff challenges the identification of properties for surveying and fence construction as "relating to political and other considerations not rationally related to the effective and practical considerations the government is

---

[12]Likewise, plaintiff's Seventh Cause of Action, which challenges the agency's "failure to exercise discretion regarding location of border wall" is, by its own terms, committed to agency discretion, and therefore, judicially unreviewable. Plaintiff contends DHS has failed to "assess the most practical and effective locations for a border fence as required by the 2008 Appropriations Act, and is instead building the fence "in the areas set forth in the now-repealed provisions of the Secure Fence Act of 2006." Seventh Cause of Action. Yet, nothing in the 2008 Appropriations Act provides a standard by which to measure the agency's choice of where to locate the fence. In fact, while the 2006 Secure Fence Act required the fence to be located in certain areas, those provisions have been repealed, and location is, as plaintiff admits, within the Secretary's discretion. Consequently, the Seventh Cause of Action does not state a judicially reviewable claim.

statutorily required to consider when determining where to fence the border," and thus, the equal protection clause of the Constitution is violated.  Sixth Cause of Action.

To comport with equal protection standards, the government's treatment of plaintiff need only meet a rational basis.  Strict scrutiny of government action occurs only if a fundamental right or a suspect class based on immutable characteristics, such as race or nationality, is involved. Nicholas v. Riley, 874 F. Supp. 10, 12 (D.D.C. 1995).   Plaintiff is not a suspect class, and any property rights or other rights they claim are not fundamental. Ortwein v. Schwab, 410 U.S. 656, 660 (1973) (per curiam).

Since there is no fundamental right or suspect classification at issue here, defendants need only show a rational relationship between the government actions and a legitimate state interest. City of New Orleans v. Dukes, 427 U.S. 297, 303-04 (1976); Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  Here, the government's choice of properties for surveying and for the likely location of the fence is rationally related to the purpose of the statute – to secure the border.

Moreover, to the extent plaintiff's Complaint can be read to challenge the condemnation actions, plaintiff evidences a misunderstanding of federal eminent domain law.  The United States may take property via condemnation so long as the congressionally authorized taking is rationally related to a conceivable public purpose – here, securing the United States' international border. United States v. 131.99 Acres of Land, Civil Action No. 7:08-cv-52, slip op. at 10–11 (S.D. Tex. Apr. 7, 2008) (Exh. 7 hereto) (citing Midkiff, 467 U.S. at 240 and United States v. Gettysburg Elec. Ry. Co., 160 U.S. 668 (1896)) ("[T]he purpose of the temporary easements sought by the Government is to help secure the United States-Mexico border. . . . Securing the border is obviously a 'conceivable public purpose' and the Government's exercise of its eminent domain

power to investigate and acquire property to secure the border is certainly rationally related to that purpose."). So long as this standard is satisfied, there is no scope for further judicial review.

Plaintiff's challenge of the identification of certain properties as necessary for the border security project is a challenge to the necessity of those takings. But

> [i]t is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

Berman v. Parker, 348 U.S. 26, 35–36 (1954). Accordingly, judicial review in this realm is "extremely narrow." Haw. Housing Auth. v. Midkiff, 467 U.S. 229, 240 (1984) (quoting Berman, 348 U.S. at 32). "[F]ederal courts do not second-guess governmental agencies on issues of necessity and expediency when condemnation is sought; such matters are within the discretion of the legislature or of administrative bodies by delegation, and the concept of justiciability limits judicial review to the bare issue of whether the limits of authority were exceeded." United States v. 162.20 Acres of Land, 639 F.2d 299, 303 (5th Cir. 1981).

Congress left the location of border security infrastructure, including physical fencing, to the discretion of the Secretary of Homeland Security. This delegation includes the Secretary's authorization to identify and acquire interests in properties necessary, in his judgment and discretion, for the border security project. Indeed, as the Complaint acknowledges, the 2008 Appropriations Act expanded the discretion of the Secretary in these decisions, removing statutory language of the 2006 Secure Fence Act that rigidly defined the type and location of border security infrastructure and instead placing these decisions in the sole discretion of the Secretary.

28

The selection of properties for surveying and fence construction must be sustained if there is a rational relationship between the statute and a legitimate governmental purpose. As explained above, that rational relationship exists here, and the Sixth Cause of Action should be dismissed.[13]

**CONCLUSION**

For the reasons expressed above, the Complaint should be dismissed.

Dated: August 27, 2008                                    Respectfully submitted,

                                                          RONALD J. TENPAS
                                                          Assistant Attorney General


                                                           /s/ Donna S. Fitzgerald
___

                                                          DONNA S. FITZGERALD
                                                          Trial Attorney
                                                          Connecticut Bar No. 411810
                                                          U.S. Department of Justice
                                                          Environment & Natural Resources Division
                                                          Natural Resources Section
                                                          601 D. St., N.W. Room 3104
                                                          Washington D.C. 20004
                                                          (202) 305-0476

---

[13] Even had plaintiff alleged that the selection of properties was arbitrary and capricious, or made in bad faith, this claim would still fail. When Congress delegates eminent domain power to an agency for a public use, and the agency acts within the four corners of that authority, a court may make further review only in cases of "egregious bad faith." United States v. 416.81 Acres of Land, 514 F.2d 627, 631-32 (7th Cir. 1975). "It is not the function of the federal courts to second-guess governmental agencies on issues of necessity and expediency when condemnation is sought." United States v. 2.9 Acres of Land, 554 F. Supp. 529, 531 (D. Mont. 1982) (citing, e.g., United States v. 80.5 Acres of Land, 448 F.2d 980 (9th Cir. 1970); United States v. 101.88 Acres of Land, 616 F.2d 762 (5th Cir. 1980)).

Moreover, "[t]o allege bad faith a party must charge facts rather than conclusions, and such facts must suggest actual malevolence by the officer toward the complaining party." 416.81 Acres of Land, 514 F.2d at 632. "There must be basic to the project pervasive deception, unreasoned decision, or will-of-the-wisp determination before these words of pejoration are brought into play." United States v. 2606.84 Acres in Tarrant County, 432 F.2d 1286, 1290 (5th Cir. 1970). Plaintiff has not and cannot make that showing here.

Fax: (202) 305-0506
E-mail: Donna.Fitzgerald@usdoj.gov

OF COUNSEL:

AnnMarie R. Highsmith
Associate Chief Counsel, Trade and Finance
Erin Vespe
Office of Chief Counsel
United States Customs and Border
Protection
United States Department of Homeland
Security

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TEXAS BORDER COALITION, | ) | CIV. NO. 08-848 (RBW) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MICHAEL CHERTOFF, SECRETARY, | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY; ROBERT F. | ) | |
| JANSON, ACTING EXECUTIVE DIRECTOR, | ) | |
| ASSET MANAGEMENT OF U.S. CUSTOMS | ) | |
| AND BORDER PROTECTION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF DONNA S. FITZGERALD

I am Donna S. Fitzgerald, and I am the U.S. Department of Justice attorney assigned to

this case. Attached hereto are the following seven exhibits, which I retrieved from Westlaw,

court dockets on PACER, or the internet:

1. A true and accurate copy of Section 564 of the Consolidated Appropriations Act for

Fiscal Year 2008, Public Law 110-161;

2. A true and accurate copy of the January 14, 2008 Order for Delivery of Possession in

United States v. 233.0 Acres of Land (City of Eagle Pass), Civil No. DR-08-CA-003, (W.D. Tex.

Jan. 14, 2008);

3. A true and accurate copy of the August 20, 2008 Order in United States v. 5.27 Acres

of Land, Civil No. 3:08-cv-1162 (S.D. Cal. Aug. 20, 2008);

4. A true and accurate copy of the February 1, 2008 Order in United States v. 1.03 Acres

of Land, Civil No. 08-cv-033 (D. Ariz. Feb. 1, 2008);

5. A true and accurate copy of the August 6, 2008 Order in United States v. 37.51 Acres

of Land (University of Texas-Brownsville), Civil Action No. B-08-056 (S.D. Tex. Aug. 6, 2008);

    6.  A true and accurate copy of the relevant pages from H.R. REP. NO. 110-181 (2007);

    7.  A true and accurate copy of the April 7, 2008 Order in United States v. 131.99 Acres

of Land, Civil Action No. 7:08-cv-52  (S.D. Tex. Apr. 7, 2008).

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

    Executed on this 27th day of August, 2008

                 /s/ Donna S. Fitzgerald
                Donna S. Fitzgerald
                Connecticut Bar No. 411810
                Trial Attorney
                Natural Resources Section
                Environment & Natural Resources Division
                United States Department of Justice

H. R. 2764—247

"(1) shall issue a proposed rule implementing this subtitle not later than 6 months after the date of the enactment of this subtitle; and

"(2) issue a final rule implementing this subtitle not later than 1 year after such date of enactment.

**"SEC. 899J. AUTHORIZATION OF APPROPRIATIONS.**

"There are authorized to be appropriated to the Secretary—

"(1) $2,000,000 for fiscal year 2008; and

"(2) $10,750,000 for each of fiscal years 2009 through 2012.".

(b) CLERICAL AMENDMENT.—The table of contents in section 1(b) of such Act is amended by inserting after the item relating to section 899 the following:

"Subtitle J—Secure Handling of Ammonium Nitrate

"Sec. 899A. Definitions.
"Sec. 899B. Regulation of the sale and transfer of ammonium nitrate.
"Sec. 899C. Inspection and auditing of records.
"Sec. 899D. Administrative provisions.
"Sec. 899E. Theft reporting requirement.
"Sec. 899F. Prohibitions and penalty.
"Sec. 899G. Protection from civil liability.
"Sec. 899H. Preemption of other laws.
"Sec. 899I. Deadlines for regulations.
"Sec. 899J. Authorization of appropriations.".

SEC. 564. IMPROVEMENT OF BARRIERS AT BORDER. (a) Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) is amended—

(1) in subsection (a), by striking "Attorney General, in consultation with the Commissioner of Immigration and Naturalization," and inserting "Secretary of Homeland Security"; and

(2) in subsection (b)—

(A) in the subsection heading, by striking "IN THE BORDER AREA" and inserting "ALONG THE BORDER";

(B) in paragraph (1)—

(i) in the heading, by striking "SECURITY FEATURES" and inserting "ADDITIONAL FENCING ALONG SOUTHWEST BORDER"; and

(ii) by striking subparagraphs (A) through (C) and inserting the following:

"(A) REINFORCED FENCING.—In carrying out subsection (a), the Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.

"(B) PRIORITY AREAS.—In carrying out this section, the Secretary of Homeland Security shall—

"(i) identify the 370 miles, or other mileage determined by the Secretary, whose authority to determine other mileage shall expire on December 31, 2008, along the southwest border where fencing would be most practical and effective in deterring smugglers and aliens attempting to gain illegal entry into the United States; and



GOVERNMENT EXHIBIT 1

H. R. 2764—248

"(ii) not later than December 31, 2008, complete construction of reinforced fencing along the miles identified under clause (i).

"(C) CONSULTATION.—

"(i) IN GENERAL.—In carrying out this section, the Secretary of Homeland Security shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed.

"(ii) SAVINGS PROVISION.—Nothing in this subparagraph may be construed to—

"(I) create or negate any right of action for a State, local government, or other person or entity affected by this subsection; or

"(II) affect the eminent domain laws of the United States or of any State.

"(D) LIMITATION ON REQUIREMENTS.—Notwithstanding subparagraph (A), nothing in this paragraph shall require the Secretary of Homeland Security to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location."; and

(C) in paragraph (4), by striking "to carry out this subsection not to exceed $12,000,000" and inserting "such sums as may be necessary to carry out this subsection".

(b) No funds appropriated in this Act for U.S. Customs and Border Protection "Border Security Fencing, Infrastructure, and Technology" may be obligated unless the Secretary of Homeland Security has complied with section 102(b)(2)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) as amended by subsection (a)(2).

SEC. 565. INTERNATIONAL REGISTERED TRAVELER PROGRAM. Section 7208(k)(3) of the Intelligence Reform and Terrorism Prevention Act of 2004 (8 U.S.C. 1365b(k)(3)) is amended to read as follows:

"(3) INTERNATIONAL REGISTERED TRAVELER PROGRAM.—

"(A) IN GENERAL.—The Secretary of Homeland Security shall establish an international registered traveler program that incorporates available technologies, such as biometrics and e-passports, and security threat assessments to expedite the screening and processing of international travelers, including United States Citizens and residents, who enter and exit the United States. The program shall be coordinated with the United States Visitor and Immigrant Status Indicator Technology program, other pre-screening initiatives, and the Visa Waiver Program.

"(B) FEES.—The Secretary may impose a fee for the program established under subparagraph (A) and may modify such fee from time to time. The fee may not exceed the aggregate costs associated with the program and shall be credited to the Department of Homeland Security for

FILED

JAN 1 4 2008

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

CLERK, U.S. D......... OF COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

THE UNITED STATES OF AMERICA,      )
                                   )
            Plaintiff,             )
                                   )
v.                                 )
                                   )
                                   )
233.0 ACRES OF LAND, MORE OR LESS  ) Civil No.
SITUATE IN MAVERICK COUNTY,        )
STATE OF TEXAS; and CITY OF        )
EAGLE PASS, TEXAS, ET AL.          )
                                   )
            Defendants.            )

# DR08CA003

## ORDER FOR DELIVERY OF POSSESSION

This action coming on for hearing ex parte upon motion of the Plaintiff for an order for

the surrender of possession of the property described in the Complaint filed herein to Plaintiff,

and it appearing that Plaintiff is entitled to possession of said property,

IT IS HEREBY ORDERED that all defendants to this action and all persons in

possession or control of the property described in the Complaint filed herein shall surrender

possession of said property to the extent of the estate being condemned, to the Plaintiff on or

before  January 15, 2008.

IT IS FURTHER ORDERED that a notice of this order shall be served upon all persons

in possession or control of the said property forthwith.

Dated this 14th day of January, 2008.

ALIA MOSES LUDLUM
UNITED STATES DISTRICT JUDGE

-1-

GOVERNMENT
EXHIBIT
2

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 THE UNITED STATES OF AMERICA,

CASE NO. 08-CV-1162 W (AJB)

12                       Plaintiff,

**ORDER GRANTING EX PARTE APPLICATION FOR IMMEDIATE DELIVERY OF POSSESSION (Doc. No. 5)**

13     vs.

14 5.27 ACRES OF LAND, MORE OR LESS, SITUATED IN IMPERIAL

15 COUNTY, STATE OF CALIFORNIA; and EDITH GLUD, et

16 al.,

17                    Defendants.

18     Presently before the Court is the United States' ("Plaintiff") *ex parte* application

19 for an Order for the surrender of the fee simple estate more particularly described in

20 Schedule E of the Complaint filed on June 30, 2008, over and across the property

21 described in Schedule C of said Complaint (collectively, the "Subject Property").

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

GOVERNMENT EXHIBIT 3

08cv1162W

1    It appearing that Plaintiff is entitled to possession of Subject Property, **IT IS**
2  **HEREBY ORDERED** that all Defendants to this action and all persons in possession
3  or control of the Subject Property shall surrender possession of the Subject Property to
4  Plaintiff immediately.   Plaintiff shall serve notice of this Order upon all persons in
5  possession or control of the Subject Property.

6
7
8    **IT IS SO ORDERED.**
9
10  DATED:  August 20, 2008
11
12                                   Hon. Thomas J. Whelan
13                                   United States District Judge
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4    UNITED STATES DISTRICT COURT

5    DISTRICT OF ARIZONA

6  United States of America,                    )
                                                )
7           Plaintiff,                          )    NO.  08-CV-00033-TUC-JMR
                                                )
8      v.                                       )
                                                )
9  1.03 Acres of Land, more or less,            )
   Situate in Santa Cruz County, State          )    **ORDER FOR DELIVERY**
10 of Arizona; and T. J. Webber, et al.         )    **OF POSSESSION**
                                                )
11          Defendants.                         )
                                                )
12 _____)

13         This action coming on for hearing *ex parte* upon motion of the Plaintiff for an order

14 for the surrender of possession of the property described in the Complaint filed herein to

15 Plaintiff (Doc. No. 4), and it appearing that Plaintiff is entitled to possession of said

16 property,

17         IT IS HEREBY ORDERED that all Defendants to this action and all persons in

18 possession or control of the property described in the Complaint filed herein shall surrender

19 possession of said property to the extent to the estate being condemned, pursuant to the

20 provisions of 40 U.S.C. § 3114, to the Plaintiff immediately;

21         IT IS FURTHER ORDERED that a notice of this order shall be served upon all

22 persons in possession or control of the said property forthwith.

23

24         DATED this 1st day of February, 2008.

25

26

27                                    _____
                                      John M. Roll
28                                    Chief United States District Judge



GOVERNMENT
EXHIBIT
4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

AUG - 6 2008

Michael N. Milby, Clerk of Court
By Deputy Clerk

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br>　　　Plaintiff,<br><br>v.<br><br>37.51 ACRES OF LAND, more or less, situate in<br>CAMERON COUNTY, STATE OF TEXAS;<br>TEXAS SOUTHMOST COLLEGE, ET AL.,<br>　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§　　CIVIL ACTION NO. B-08-056 |

**ORDER**

Plaintiff, the United States of America, filed a notice of dismissal with prejudice in the above-captioned case pursuant to Federal Rule of Civil Procedure 71.1(i)(1)(A). Having considered Plaintiff's notice and the settlement agreement filed in this action, the Court finds that the Plaintiff has satisfied all requirements for voluntary dismissal under Rule 71.1(i)(1)(A). Plaintiff's action is dismissed with prejudice, Defendants' Motion for Injunction (Docket No. 18) is **DENIED** as moot, and the Clerk of Court is directed to close this case. The Court, however, retains jurisdiction over all aspects of the settlement agreement (Docket No. 30) reached by the parties, including interpretation, enforcement or any other dispute of any kind.

Signed, this 6th day of August, 2008.

_____
Andrew S. Hanen
United States District Judge

GOVERNMENT
EXHIBIT
5

Case 1:08-cv-00848-RBW    Document 3-9    Filed 08/27/2008    Page 1 of 2

| 110TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
|---|---|---|
| *1st Session* | | 110–181 |

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2008

---

JUNE 8, 2007.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. PRICE of North Carolina, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

# ADDITIONAL VIEWS

[To accompany H.R. 2638]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2008.

### INDEX TO BILL AND REPORT

| | Page number Bill | Report |
|---|---|---|
| TITLE I—DEPARTMENTAL MANAGEMENT AND OPERATIONS | | |
| Office of the Secretary and Executive Management | 2 | 13 |
| Office of the Under Secretary for Management | 2 | 17 |
| Office of the Chief Financial Officer | 3 | 19 |
| Office of the Chief Information Officer | 3 | 20 |
| Analysis and Operations | 4 | 23 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding | 5 | 24 |
| Office of Inspector General | 5 | 25 |
| TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | |
| United States Customs and Border Protection | 5 | 27 |
| Salaries and Expenses | 5 | 27 |
| Automation Modernization | 8 | 33 |
| Border Security Fencing, Infrastructure, and Technology | 11 | 34 |
| Air and Marine Interdiction, Operations, Maintenance, and Procurement | 16 | 38 |
| Construction | 17 | 39 |
| United States Immigration and Customs Enforcement | 17 | 40 |



37

## PROCUREMENT PROCESS AND SYSTEM REVIEW

The Committee believes that a project of such complexity as the SBI, with a large-scale integration contract such as SBInet, merits very thorough oversight. The open-endedness of the contract calls for special, disinterested, third-party expertise to assess how and whether best procurement practices are being put into effect. The Committee is aware that the Defense Acquisition University has provided effective consultative and analytic reviews of procurement operations and contract management, including recent work done on behalf of the Coast Guard for the Deepwater program. Such a review would provide neutral insight and constructive program evaluation to CBP, the Department, and the Congress. The Committee therefore has included $2,000,000 for the SBI program office to reimburse the Defense Acquisition University for the costs of conducting such a review and making its findings available to the Department and the Committees on Appropriations.

## CONSULTATION WITH FEDERAL AGENCIES

The Committee has included bill language requiring the Department to coordinate with the National Park Service, the U.S. Fish and Wildlife Service, the Forest Service, the Bureau of Indian Affairs, and the Bureau of Land Management on any decisions related to construction of tactical infrastructure on lands administered by those agencies and, to the extent practicable, to minimize impacts on wildlife and natural resources.

## CONSULTATION WITH STATE AND LOCAL COMMUNITIES

The Committee has included language requiring the Department to solicit input from State and local communities regarding its fencing and tactical infrastructure plans. The Committee is aware that the Department has recently begun to consult with States and local governments in some affected border communities, and directs the Secretary to continue such consultation or initiate it immediately. The Committee directs that border security fencing and tactical infrastructure installations be implemented in ways that take full advantage of natural terrain and barriers and minimize adverse impacts on the environment and local communities.

## NORTHERN BORDER INVESTMENT

The Committee is concerned with the lack of SBI investment and planning on the Northern Border. To better understand what direction the Department is taking with regard to such efforts, the Committee directs the SBI Program Executive Office to brief the Committee not later than July 1, 2007, on how the Department expects to use the $20,000,000 the Committee directed be applied to Northern Border investments, and to provide a revised SBInet investment strategy that includes the Northern Border.

## PROJECT 28

The Committee is very interested in knowing the results of Project 28 as soon as they are available, and directs CBP to brief the Committee on those results and how they will affect the SBInet investment strategy as soon as they are known.

United States District Court
Southern District of Texas
ENTERED

APR 0 7 2008

Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

THE UNITED STATES OF AMERICA,  §
    Plaintiff,  §
      §
v.  §  CIVIL ACTION NO. M-08-052
      §
131.99 ACRES OF LAND, more or less, situate in  §
STARR COUNTY, STATE OF TEXAS; and  §
RIO GRANDE CITY CONSOLIDATED  §
INDEPENDENT SCHOOL DISTRICT,  §
    Defendants.  §

## ORDER

I.    PROCEDURAL HISTORY AND NATURE OF THE OBJECTIONS

Plaintiff, United States of America (the "United States"), filed a complaint in condemnation

and declaration of taking against Defendant Rio Grande City Consolidated Independent School

District ("RGCCISD") and its property under the authority granted by 8 U.S.C. § 1103(b)(3) and 40

U.S.C. § 3113. (Docket Nos. 1, 2). The United States seeks a temporary easement on RGCCISD's

property to conduct surveying, testing and other investigatory work necessary to plan the

construction of the fence and accompanying structures designed to secure the United States-Mexico

border. (Docket No. 2 at Schedules B, E).

That same day, the United States filed a motion for possession requesting that this Court

enter an *ex parte* order giving the Government immediate possession of the property interest

pursuant to its actions under the Declaration of Taking Act ("DTA"). (Docket No. 4). This Court

denied the United States' request for *ex parte* relief and held oral arguments on the motion. (Docket

No. 9). At that hearing, counsel for the United States and RGCCISD presented oral arguments to

1



GOVERNMENT
EXHIBIT
7

the Court and representatives of RGCCISD testified regarding the interaction they have had with the

Government regarding the property interest. (Transcript of March 17, 2008 Hearing at 64-91).

In addition to the arguments of counsel and the testimony, RGCCISD filed an Amended

Answer stating the following objections to the United States's acquisition of the interest in its

property:

(1)     The United States failed to negotiate prior to initiating
        condemnation proceedings as required by 8 U.S.C. § 1103(b)
        and, thus, lacks statutory authority to bring this action;

(2)     The United States failed to abide by consultation provision
        enacted by the Consolidated Appropriations Act, 2008;

(3)     The United States is not entitled to immediate possession of
        the property interest;

(4)     The United States has violated the Fifth Amendment to the
        United States Constitution because the intended purpose of
        the taking does not constitute a public use; and

(5)     The amount of the estimated compensation is not just
        compensation.

(Docket No. 6). The Government then filed a Motion to Strike the Amended Answer. (Docket Nos.

10, 11). The majority of RGCCISD's objections are similar to objections raised by Defendant Eloisa

G. Tamez ("Tamez") in a similar action before this Court. *See generally United States v. 1.04 Acres*

*of Land, More or Less, Situate in Cameron County, State of Texas*, Civil Action No. 1:08-cv-44,

2008 WL 628589 (S.D. Tex. Mar. 7, 2008). To the extent the RGCCISD's objections mirror

Tamez's objections, the Court hereby issues the same rulings from its holding in the Tamez's case,

and sets out those rulings in an abbreviated fashion below. Counsel are invited to review the order

in the Tamez matter for the more-detailed explanation of the Court's rulings. (*See id.*)

2

II.    DISCUSSION

    A.    Bona Fide Efforts to Negotiate

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") requires that the Government put forth a bona fide effort to determine whether an agreement can be reached with the owner of the interest in property prior to receiving possession of the interest in a condemnation action. *United States v. 1.04 Acres of Land, More or Less, Situate in Cameron County, State of Texas*, Civil Action No. 1:08-cv-44, 2008 WL 628589, at \*15 (S.D. Tex. Mar. 7, 2008). Nevertheless, the Government's right to acquire property cannot be made a "barren right by the unwillingness of property holders to sell." *Kohl v. United States*, 91 U.S. 367, 371 (1875). A landowner cannot prevent the United States from condemning his or her property by refusing to sell, stalling negotiations, or being unwilling to set a price on an interest in his or her property. *See id.* In addition, the amount of compensation paid for an interest in property must be just to both the owner *and* the public taxpayers who pay for it. *See Bauman v. Ross*, 167 U.S. 548, 574 (1897).

Other parties involved in similar condemnation actions with the Government have sought guidance from the Court with regard to the issue of negotiation. While the nature of what constitutes a bona fide effort may vary from case to case, this Court now offers the following guidance.

There are certain essential elements in any contract for the sale of land. *See, e.g., Zurcher v. Herveat*, 605 N.W.2d 329, 336-37, 337 n.11 (Mich. App. 1999) (conducting a review of the law of several states regarding the essential elements for a sale of land). These elements may vary depending on the circumstances. Some may be needed in one transaction while not in another. The fact, in the instance case, that the Government has an ultimate right of eminent domain and is currently seeking only a temporary easement certainly changes the circumstances from those in a sale

3

of the fee simple title involving a willing buyer and willing seller. Nevertheless, even in these circumstances, the negotiations would have to include the following elements: (i) the identities of the parties; (ii) an adequate description of the property interest; and (iii) the price to be paid for the property interest. *Zurcher*, 605 N.W.2d 336-37; *see Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927-28 (Tex. App.–Tyler 2007) (citing *Lynx Exploration and Prod. Co. v. 4-Sight Operating Co.*, 891 S.W.2d 785, 788 (Tex. App.–Texarkana 1995). While some states require that the terms of entry be included in a contract for sale, *see, e.g., Satellite Dev. Co. v. Bernt*, 429 N.W.2d 334, 337 (Neb. 1988), in a condemnation action brought under the DTA, the Court may set the terms of entry. *See* 40 U.S.C. § 3114(d). Where the Government is seeking land for the construction of the border fence, Congress has further enacted a consultation clause that provides a forum for the discussion of the terms of entry. *See infra* Section II(B).

Considering the provisions of the DTA and the consultation clause, where the Government is seeking a temporary easement merely to survey or conduct tests on a property, many issues, including notification of the specific investigation needed and the specific timing of entry onto the property are more appropriately considered during post-possession consultation between the parties. This Court finds that the pre-possession effort to negotiate should include at a minimum: the identity of the parties, location of the property, a description of the interest sought, and the price to be paid for that interest.

In August of 2007, Thelma Ramey, Assistant Superintendent for Finance with RGCCISD, testified that she received a phone call and a visit from the United States Border Patrol regarding the proposed right of entry onto a portion of RGGCISD's property. (Transcript of March 17, 2008

4

Hearing at 66).[1] Kendra McCown, a Realty Specialist with the United States Army Corps of Engineers, delivered the proposed right of entry to Ms. Ramey. (*See id.*); (Motion to Strike Amended Answers, Attachment #1, Affidavit of Rocky D. Lee [hereinafter Lee Aff.] at ¶ 3). Ms. McCown explained that the initial entry was for a survey only. (Transcript of March 17, 2008 Hearing at 66). Ms. Ramey testified that the nature of the entry was not explained except that the Government would be doing "some testing of the land . . . ." (*Id.* at 67). Ms. Ramey informed the agents that the School Board would decide whether RGCCISD would agree to the right of entry. (*Id.*) The Government did not ask RGCCISD to sign anything during that initial meeting. (*Id.*)

The request for a right of entry was set on the agenda for the September 11, 2007 RGCCISD School Board meeting. (Transcript of March 17, 2008 Hearing at 67). The agenda booklet for the meeting included the proposed right of entry. (*Id.* at 68); (*see* Ex. 8). This right of entry had a blank in the space for length of time that the Government proposed to have access to the property. (*Id.*); (*see* Transcript of March 17, 2008 Hearing at 68). While Ms. Ramey testified that the document did not offer any compensation to RGCCISD, (*Id.* at 69), the proposed right of entry would have compensated RGCCISD for any damages caused by the Government during the exercise of the right of entry. (Ex. 8).

Ms. McCown and Theresa Broomhall, a second Realty Specialist, and a negotiator from Customs and Border Protection attended the School Board meeting. (Transcript of March 17, 2008 Hearing at 69-70); (Lee Aff. at ¶ 4). They did not inform the School Board that they were present to engage in any negotiation with the School Board. (Transcript of March 17, 2008 Hearing at 77,

---

[1] Roel A. Gonzalez, Superintendent of Schools for RGCCISD, also testified on behalf of the Defendant. Mr. Gonzalez testified that all of Ms. Ramey's testimony was accurate as far his knowledge was concerned.

80). Ms. McCown addressed the members of the School Board and answered questions posed by the School Board. (*Id.* at 70); (Lee Aff. at ¶ 4). Ms. Ramsey testified that the agents told the School Board that there were some tests that needed to be done on RGCCISD's property, but did not or could not provide the School Board with the specific tests that would be conducted. (Transcript of March 17, 2008 Hearing at 69). During the meeting, one School Board member stated that he was opposed to the border fence. (*Id.* at 75); (Lee Aff. at ¶ 4)

The only question Ms. McCown apparently did not answer during the meeting was whether the Government was "going to build the fence or not." (Transcript of March 17, 2008 Hearing at 74). Mr. Gonzalez testified, however, that the School Board lacked a full and fair opportunity to ask questions to the Government agents as he and the School Board were not provided: (1) maps of the land subject to the right of entry or (2) an opportunity "to have a dialogue and a conversation . . . with each other . . . ." (*Id.* at 88). He testified that the meeting was "just information. It happened rather quickly, and that was it." (*Id.* at 89).

The Government avers that Ms. McCown asked the School Board to agree to the proposed right of entry at the meeting. (Lee Aff. at ¶ 4). Ms. Ramey testified, to the contrary, that the Government agents did not ask the School Board to grant the right of entry. (Transcript of March 17, 2008 Hearing at 70, 75). Both parties agree, however, that after Ms. McCown finished speaking with the School Board, the Board refused to vote on the proposed right of entry. (*Id.* at 75); (Lee Aff. at ¶ 4). The School Board voted to table the discussion until a later meeting. (*Id.*); (Transcript of March 17, 2008 Hearing at 75).

According to the Government, on October 3, 2007, a negotiator from Customs and Border Protection called Ms. Ramey to follow-up on the discussions at the September meeting. (Lee Aff.

6

at ¶ 5). She did not return the negotiator's call. (*Id.*) Ms. Ramey testified that she could not find any record in her call log that she had received a call in October. (*See* Transcript of March 17, 2008 Hearing at 71). She further testified that she is not authorized to negotiate any type of agreement with the Government and that she refers any negotiations to the School Board. (*Id.* at 72). Only the School Board President and the School Board itself are authorized to act on behalf of the School Board, unless the Board designates another individual to negotiate on its behalf. (*Id.*)

On December 5, 2007, John Myers, another Realty Specialist from the Corps of Engineers again called Ms. Ramey. (Lee Aff. at ¶ 6). Ms. Ramey remembers speaking with David Pagen from the United States Border Patrol in December of 2007, but her call log does not have her speaking to Mr. Myers until January 7, 2008. (*Id.* at 71-72). She informed Mr. Myers that the School Board takes the survey and the construction of the fence "hand in hand." (*Id.* at 72). The School Board opposes both the border fence and the right of entry. (*Id.* at 76). Ms. Ramey told Mr. Myers that the School Board would not bring the right of entry up for a vote, (*Id.* at 72); (Lee Aff. at ¶ 6), and stated that the right of entry presented was unacceptable. (Transcript of March 17, 2008 Hearing at 72).

On December 7, 2007, the Corps of Engineers sent RGCCISD a letter reiterating the Government's need to acquire temporary access to the property and stating that if the School Board would not agree to a voluntary right of entry, the Government would file a condemnation action. (Lee Aff. at ¶ 7). According to the Lee affidavit, the letter asked RGCCISD to contact the Corps of Engineers if it had any questions or if the School Board was willing to allow the United States access to the land. (*Id.*) The Government avers it has not received any response from RGCCISD since sending the letter. (*Id.* at ¶ 8). The School Board never made a counteroffer to the Government's proposed right of entry. (Transcript of March 17, 2008 Hearing at 76). Ms. Ramey, however,

7

indicated that the School Board was not aware that it could negotiate with the Government or that the Government. (*Id.*)

Mr. Gonzalez testified to additional concerns about: (i) the safety of the students during the Government's use of the property and (ii) minimizing the impact of the surveying on the Chachalaca Wildlife Refuge and historic Fort Ringgold. (Transcript of March 17, 2008 Hearing at 85). These concerns are more appropriately addressed as a part of the Congressionally-mandated consultation that may occur, if needed, subsequent an order on possession from the Court.

It is not clear from the Government's affidavit or the testimony presented that the Government engaged in bona fide negotiations in a manner consistent with this Court's outline of negotiation set out above. This Court feels the heightened need for the parties to participate in meaningful talks both before and after any taking due to the immediate presence of children in the vicinity of the proposed fence. While it is unclear in the record as to whether RGCCISD designated an individual with the authority to negotiate on its behalf or the identity of such a person, if one was designated, this problem is now alleviated as RGCCISD is presently represented by counsel. The Court will give both parties until Friday, April 18, 2008 to supplement the record with further evidence of negotiations or efforts to negotiate. After that date, the Court will proceed to rule on the merits of this aspect of the Government's petition for relief.[2]

---

[2] RGCCISD's amended answer contends that if the United States did not negotiate or negotiate in a bona fide manner with it prior to filing suit, then the United States lacks the authority to bring this action under 8 U.S.C. § 1103(b)(3). RGCCISD further asserts that if this is the case, the action should be dismissed pursuant to Federal Rule of Civil Procedure 71.1(i)(1)(C). The issue of whether the Government has satisfied the requirement of negotiating with a property owner does not go to the jurisdiction of the court. *Wilson v. Union Elec. Light & Power Co.*, 59 F.2d 580, 582 (8th Cir. 1932). Where the Government has filed a complaint in condemnation and declaration of taking and is proceeding pursuant to its powers of eminent domain, the court has general jurisdiction over the subject matter in this case and jurisdiction over the parties. *See id.* Under the "appropriate allegations, the subject-matter and the parties" are, thus, before a court authorized to act. *See id.*

The Government has filed a complaint in condemnation and declaration of taking in this action seeking to proceed pursuant to the eminent domain powers of the United States. (Docket Nos. 1, 2). This Court, thus, has

B.      The Consultation Clause in the Consolidation Appropriations Act of 2008

Only an express authorization from Congress can create a defense to a condemnation action.

*United States v. 162.20 Acres of Land, More or Less, Situated in Clay County, Mississippi*, 639 F.2d

299, 304-05 (5th Cir. 1981). This Court has held that the language of the consultation clause and

its accompanying savings provision do not create an express statement that non-compliance with the

consultation clause is a defense to this action at this stage. *United States v. 1.04 Acres of Land, More*

*or Less, Situate in Cameron County, State of Texas*, Civil Action No. 1:08-cv-44, 2008 WL 628589,

at *16-17 (S.D. Tex. Mar. 7, 2008). As drafted by Congress, the consultation clause is, thus, not a

defense to the Government's acquisition of a property interest.

This Court is empowered to provide terms and conditions when granting an order of

possession following the filing of a declaration of taking that the United States must fulfill prior to

entering onto the property. 40 U.S.C. § 3114(d)(1). Given the mandatory language of the

consultation clause, that "the Secretary of Homeland Security *shall* consult . . .," this Court may find

it proper to require compliance with the consultation clause, when appropriate, as a condition prior

---

jurisdiction over this matter and under the proper allegations, can take action in this matter. *See Wilson*, 59 F.2d at 582. Having confirmed jurisdiction, this Court finds that dismissing the action upon an allegation that the United States did not negotiate with RGCCISD could be an appropriate remedy, but not a remedy that is mandated. Upon finding that there is insufficient evidence in the record of whether the Government engaged in a bona fide effort to negotiate with a property owner, this Court may also stay the case temporarily and require further evidence of negotiations pursuant to the requirements of 8 U.S.C. § 1103(b)(3) before proceeding. The Court finds nothing in the Federal Rules of Civil Procedure nor in § 1103 which would prohibit this Court from staying the matter pending compliance with § 1103. To dismiss this case only to have it re-filed would be a frivolous action and courts should not do vain or useless things or grant decrees which would not confer any real benefit or effect any real relief. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 744 (U.S. 1971) (J. Marshall, concurring); *Stewart v. United States*, 327 F.2d 201, 202 (10th Cir. 1964).

to entry onto the property after the taking has been completed. *See* 8 U.S.C. § 1103 note (Section 102(b)(1)(C)); *162.20 Acres of Land*, 639 F.2d at 304-305.[3]

      C.     Immediate Possession

RGCCISD asserts that the United States is not entitled to "immediate possession" under the DTA. This Court denied the Government's request to rule on its motion for possession *ex parte*, (Docket No. 9), and RGCCISD then presented oral arguments and testimony in this action. Any objection to the *ex parte* nature of the proceedings is moot. Further, because the expedited procedure of the DTA is available to the Government in this action, any objection to the expedited nature of these proceedings is overruled. RGCCISD's concerns about having an opportunity to discuss the terms of entry will be best addressed by the post-possession consultation mandated by Congress.

      D.     Public Use

The Defendant asserts that the Government's proposed survey does not promote a "public use" as required for a taking by the United States. *See* U.S. CONST. amend. V. Defendant contends the proposed work does not fall within the Government's sovereign police powers as the work does not rationally serve the public interest or public welfare. The role of a Court in reviewing a legislature's judgment of what constitutes a public use is "extremely narrow." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 240 (1984) (quoting *Berman v. Parker*, 348 U.S. 26, 32 (1954)). A court should not "substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" *Id.* at 240 (quoting *United States*

---

[3] This Court realizes that, given the nature of the eminent domain scheme implemented by the Government, there may, in fact, be two takings (one for the exploratory easement and one when the Government actually seeks to move forward on construction). This may require multiple consultations in some cases. In other instances, given the remoteness of the property interest and lack of use by the landowner, there may be no need for extensive consultation. Furthermore, the consultation may be part and parcel of the negotiations between the property interest owner and the Government.

*v. Gettsburg Elec. Ry. Co.*, 160 U.S. 668 (1896)). "[W]here the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause." *Id.* at 241.   The Court previously noted that purpose of the temporary easements sought by the Government is to help secure the United States-Mexico border. *Unites States v. 1.04 Acres of Land, More or Less, Situate in Cameron County, Texas*, Civil Action No. 1:08-cv-44, 2008 WL 628589, at *3 (S.D. Tex. Mar. 7, 2008).   Securing the border is obviously a "conceivable public purpose" and the Government's exercise of its eminent domain power to investigate and acquire property to secure the border is certainly rationally related to that purpose.

      E.    Estimated Amount of Just Compensation

      Lastly, RGCCISD objects to the amount of the United States' deposit of estimated just compensation for the acquisition of the interest in its land.   The Fifth Circuit has held that a district court cannot review the amount of estimated compensation that the Government deposits. *In re United States*, 257 F.2d 844, 848 (5th Cir. 1958).   The DTA gives the Government, and not the courts, the ability to determine the estimate of the compensation to be deposited because the DTA is intended to get the Government possession of an interest in property as soon as possible. *See id.*; *United States v. 6.75 Acres of Land*, 148 F.2d 618, 619-20 (5th Cir. 1945).[4]   This Court is bound by the decisions of the Fifth Circuit and cannot review the amount of the Government's deposit. RGCCISD's objection to the amount of the deposit is overruled.   The DTA, however, recognizes that

---

[4] There are a small number of courts outside the Fifth Circuit that permit a district court to review the Government's deposit to determine whether the deposit was in bad faith or whether the deposit was made arbitrarily. *See, e.g., Lee v. United States*, 57 F.2d 879, 880 (D.C. Cir. 1932).   This Court cannot consider these decisions since it is bound by the Fifth Circuit, which has clearly spoken on the issue.

the Government's estimate may be incorrect and, along with Federal Rule of Civil Procedure 71.1, provides for a trial where the landowner can seek just compensation for the interests acquired by the Government. *United States v. Miller*, 317 U.S. 369, 381 (1943).

III.    CONCLUSION

Upon consideration of the motion and pleadings of the United States and the briefs, testimony and exhibits provided by RGCCISD, this Court finds that: (i) there is insufficient evidence as to whether there have been bona fide efforts to negotiate with RGCCISD; (ii) the consultation clause of the note to 8 U.S.C. § 1103 is not a defense to the United States' DTA action, but it may be a defense to later activity by the Government; (iii)  the Court previously denied the Government's request to proceed *ex parte* in this action, therefore, this objection is moot; (iv) the easement sought by the Government is for a public use as required for a taking under the Fifth Amendment to the United States Constitution; and (v) this Court does not have the authority to review the amount of the deposit of estimated just compensation by the United States.

Consequently, the Court hereby overrules RGCCISD's objections to: (1) the failure to comply with the consultation clause; (2) whether the easement serves a public use; and (3) the inadequacy of deposit of estimated compensation.  RGCCISD's objections concerning the failure of the Government to abide by the consultation clause are denied without prejudice to the ability to reassert those objections at a later point in time.  The Court reserves its ruling with regard to whether the facts demonstrate a bona fide effort to negotiate until April 19, 2008.  Both parties have until Friday, April 18, 2008 to either partake in negotiations and/or provide this Court with any relevant evidence they may have concerning the existence of bona fide negotiations or an attempt to negotiate.

12

Signed, this 7th day of April, 2008.

Andrew S. Hanen
United States District Judge

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    THIS COURT LACKS SUBJECT MATTER JURISDICTION  . . . . . . . . . . . . 4

      B.    TEXAS BORDER COALITION LACKS STANDING  . . . . . . . . . . . . . . . . . 12

      C.    THE COMPLAINT FAILS TO STATE A CLAIM  . . . . . . . . . . . . . . . . . . . . . 15

            1.    THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED
                  BECAUSE ACTUAL NEGOTIATION WITH LANDOWNERS
                  IS NOT REQUIRED PRIOR TO CONDEMNATION UNDER
                  THE AUTHORIZING LEGISLATION AND, FURTHERMORE,
                  THE UNITED STATES DID ATTEMPT TO NEGOTIATE WITH
                  LANDOWNERS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            2.    THERE IS NO CAUSE OF ACTION UNDER THE SECOND
                  AND FIFTH CAUSES OF ACTION BECAUSE RULEMAKING
                  IS NOT LEGALLY REQUIRED HERE  . . . . . . . . . . . . . . . . . . . . . . . 17

            3.    THE THIRD CAUSE OF ACTION FAILS TO STATE A
                  CLAIM BECAUSE THE UNITED STATES IS AUTHORIZED
                  TO USE THE DECLARATION OF TAKING ACT  . . . . . . . . . . . . . 20

            4.    THERE IS NO CAUSE OF ACTION UNDER THE
                  CONSULTATION PROVISION OF THE 2008
                  APPROPRIATIONS ACT, AND THE FOURTH CAUSE
                  OF ACTION MUST BE DISMISSED WITH PREJUDICE  . . . . . . . 24

            5.    PLAINTIFF'S EQUAL PROTECTION CLAIM FAILS
                  BECAUSE THE CONDEMNATIONS ARE RATIONALLY
                  RELATED TO A CONGRESSIONALLY AUTHORIZED
                  PUBLIC PURPOSE, AND THIS COURT CAN LOOK NO
                  FURTHER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

TABLE OF AUTHORITIES

FEDERAL CASES                                                                PAGE

American Immigration Lawyers Ass'n v. Reno,
    18 F.Supp.2d 38 (D.D.C. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Auster v. Ghana Airways, Ltd.,
    514 F.3d 44 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Bauman v. Ross,
    167 U.S. 548 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Bennett v. Spear,
    520 U.S. 154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Berman v. Parker,
    348 U.S. 26 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Blancett v. U.S. Bureau of Land Management,
    2006 WL 696050 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Catlin v. United States,
    324 U.S. 229 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Center for Biological Diversity v. Veneman,
    394 F.3d 1108 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Chemical Weapons Working Group, Inc. v. Dep't of the Army,
    111 F.3d 1485 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
City of New Orleans v. Dukes,
    427 U.S. 297 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Fund for Animals v. BLM,
    460 F.3d 13 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Garcia v. United States,
    666 F.2d 960 (5th Cir. Unit B 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Haw. Housing Auth. v. Midkiff,
    467 U.S. 229 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28
Heckler v. Chaney,
    470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Hunt v. Washington State Apple Adver. Comm'n,
    432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
In re Medicare Reimbursement Litigation,
    414 F.3d 7 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Kassem v. Washington Hospital Center,
    513 F.3d 251 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Khadr v. United States,
    529 F.3d 1112 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Kohl v. United States,
    91 U.S. 367 (1875) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FEDERAL CASES                                                                PAGE

Lujan v. National Wildlife Federation,
    497 U.S. 871 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,8,11
National Railroad Passenger Corp. v. Boston & Maine Corp.,
    503 U.S. 407 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19
National Wildlife Fed'n v. Caldera,
    Civ. No. 00-1031, 2002 WL 628649 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 11
Nicholas v. Riley,
    874 F. Supp. 10 (D.D.C. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Nordlinger v. Hahn,
    505 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Norton v. Southern Utah Wilderness Alliance ("SUWA"),
    542 U.S. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,9,18,19,20
Ortwein v. Schwab,
    410 U.S. 656 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
Polson Logging Co. v. United States,
    149 F.2d 877 (9th Cir. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22
Reese Brothers, Inc. v. U.S. Postal Service,
    531 F.Supp.2d 64 (D.D.C. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Searl v. Sch. Dist.,
    133 U.S. 553 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Sierra Club v. Morton,
    405 U.S. 727 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Sierra Club v. Peterson,
    228 F.3d 559 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11
United States ex rel. Tenn. Valley Auth. v. Welch,
    327 U.S. 546 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
United States v. 1.04 Acres of Land,
    538 F.Supp.2d 995 (S.D. Tex. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15,24
United States v. 1.33 Acres of Land,
    9 F.3d 70 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
United States v. 37.51 Acres of Land (University of Texas-Brownsville),
    Civil Action No. B-08-056 (S.D. Tex. August 6, 2008) . . . . . . . . . . . . . . . . . . . . . . 20
United States v. 162.20 Acres of Land,
    639 F.2d 299 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
United States v. 2.9 Acres of Land,
    554 F. Supp. 529 (D. Mont. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
United States v. 5.27 Acres of Land,
    Civil No. 3:08-cv-1162 (S.D. Cal. Aug 20, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 16
United States v. 80.5 Acres of Land,
    448 F.2d 980 (9th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

FEDERAL CASES                                                                      PAGE

United States v. 101.8 Acres of Land,
    616 F.2d 762 (5th cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
United States v. 233.0 Acres of Land (City of Eagle Pass)
    Civil No. DR-08-CA-003 (W.D. Tex. Jan. 14, 2008) . . . . . . . . . . . . . . . . . . . . . . . 15,16
United States v. 416.81 Acres of Land,
    514 F.2d 627 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
United States v. 2,049.85 Acres of Land,
    45 F. Supp. 731 (S.D. Tex. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23
United States v. 2606.84 Acres in Tarrant County,
    432 F.2d 1286 (5th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
United States v. Gettysburg Elec. Ry. Co.,
    160 U.S. 668 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
United States v. Kennedy,
    278 F.2d 121 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
United States v. Meyer,
    113 F.2d 387 (7th Cir. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
United States v. Rodriguez,
    60 F.3d 193 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,
    454 U.S. 487 (U.S. Pa. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
 Warth v. Seldin,
    422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Washington Legal Foundation v. United States Sentencing Commission,
    89 F.3d 897 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
West, Inc. v. United States,
    374 F.2d 218 (5th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Whittle v. United States,
    7 F.3d 1259 (6th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATE CASES

United States v. 5.27 Acres of Land,
    Civil No. 3:08-cv-1162, Doc. No. 6 (S.D. Cal. Aug. 20, 2008) . . . . . . . . . . . . . . . . . 16

FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 551(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18
5 U.S.C. § 551(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
5 U.S.C. §§ 551(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5 U.S.C. §§ 551(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5 U.S.C. §§ 551(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

iv

FEDERAL STATUTES AND REGULATIONS                              PAGE

5 U.S.C. §§ 551(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5 U.S.C. §§ 551(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5 U.S.C. §701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,26
5 U.S.C. § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6
5 U.S.C. § 704 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
5 U.S.C. § 706(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,9,18

6 U.S.C. §§ 251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
6 U.S.C. §§ 291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. § 1103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,24
8 U.S.C. § 1103(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,20
8 U.S.C. § 1103(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
8 U.S.C. § 1103(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
8 U.S.C. §1103(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
8 U.S.C. 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
28 U.S.C. § 1358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
28 U.S.C. § 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
28 U.S.C. § 1651 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

40 U.S.C. § 3113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21,22,23
40 U.S.C. § 3114 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21, 23
40 U.S.C. § 3114(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

43 U.S.C. § 1701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
43 U.S.C. § 1782(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

45 U.S.C. § 562(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16,19

H.R. Rep. No. 110-181, at 37 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pub. L. 109-367 Sec. 2, 120 Stat. 2638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Pub. L. No. 104-208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Pub. L. No. 107-296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Pub. L. No. 110-161, Div. E, title V, § 564, 121 Stat. 2090 . . . . . . . . . . . . . . . . . 3, 24

Act of August 1, 1888 (Chapter 728, 25 Stat. 357) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FEDERAL RULES OF CIVIL PROCEDURE

Federal Rules of Civil Procedure 12(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4,6
Federal Rule of Civil Procedure 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4,6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TEXAS BORDER COALITION,

     Plaintiff,

v.

MICHAEL CHERTOFF, SECRETARY,
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; ROBERT F. JANSON,
JANSON, ACTING EXECUTIVE DIRECTOR,
ASSET MANAGEMENT OF U.S. CUSTOMS
AND BORDER PROTECTION,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CIV. NO. 08-848 (RBW)

(PROPOSED) ORDER

  Defendants' motion to dismiss came before this Court on August 27, 2008.  After

considering said motion, plaintiff's response, and all other relevant matters, defendants' motion is

hereby GRANTED, and plaintiff's Complaint is dismissed.

Dated:  _____


_____
UNITED STATES DISTRICT COURT